IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **MARY DIFEDERICO, et al.,** | * | |
| Plaintiffs, | * | |
| v. | * | Case No. RWT 11-cv-1508 |
| **MARRIOTT INTERNATIONAL, INC.,** | * | |
| Defendant. | * | |

## OPINION

This case involves the tragic death in 2008 of Albert DiFederico that resulted from a terrorist attack in Pakistan on the Marriott Islamabad Hotel ("Hotel").[1] At the time, Mr. DiFederico was serving in that country as a civilian contractor for the State Department.

## Procedural Background

On June 2, 2011, Mr. DiFederico's widow and three sons brought a wrongful death and survival action in this Court against Marriott International, Inc. ("Marriott"). In the original Complaint, the DiFedericos alleged that Marriott "was at all times material hereto the operator and owner of the Islamabad Marriott Hotel." Complaint, ¶ 7, ECF No. 1. Apparently, the Plaintiffs soon thereafter learned that Marriott was neither the owner nor the operator of the Hotel. On June 23, 2011, they filed an Amended Complaint in which paragraph 7 was changed to provide that Marriott "was at all times material hereto the franchisor of the Islamabad Marriott Hotel." Amended Complaint, ¶ 7, ECF No. 3. The complaint did not name as a Defendant the actual owner, operator and franchisee of the Hotel, Hashwani Hotels Limited ("Hashwani"), a

---

[1] The details of the attack are described in the opinion of the Fourth Circuit in *DiFederico v. Marriott International*, 714 F.3d 796, 799 (2013). The attack on the Hotel was also portrayed in the 2012 movie "Zero Dark Thirty" distributed in the United States by Columbia Pictures.

Pakistan company. In order to justify imposing liability on Marriott, the DiFedericos alleged that Marriott "controlled all aspects of anti-terrorism security at the Marriott Islamabad Hotel." Amended Complaint, ¶ 40, ECF No. 3.

On September 19, 2011, Marriott moved to dismiss the Amended Complaint on the basis of *forum non conveniens*. In a Memorandum Opinion and Order filed April 26, 2012, this Court granted the motion, concluding that otherwise "Marriott would have to defend against claims arising from alleged acts or omissions by third parties in a distant foreign country" and the "case would likely require the testimony of Pakistani citizens, which this Court cannot compel to appear before it; a majority of the sources of proof are in Pakistan; and Marriott's inability to implead third parties would prejudice it by not having before the jury those independent entities tasked with securing the hotel." Opinion, p. 19, ECF No. 36. In its Opinion filed May 1, 2013, the United States Court of Appeals for the Fourth Circuit reversed and remanded the case to this Court. *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796 (4th Cir. 2013).

On June 13, 2013, this Court issued its Scheduling Order, and on June 24, 2013, the Plaintiffs filed a Second Amended Complaint. ECF Nos. 53, 57. In response, Marriott filed on August 5, 2013, a Motion to Dismiss for Failure to State a Claim. ECF No. 65. On November 6, 2013, a hearing on the Defendant's motion was held, at the conclusion of which it was denied. ECF No. 84.

In arguing unsuccessfully for dismissal, Marriott contended that the allegations of the Second Amended Complaint were insufficient to attribute liability to it because "it did not create any (security) plan for the Hotel or coordinate any security at the Hotel." ECF No. 115-2, p. 13. It pointed out that the Plaintiffs have consistently argued that it is "the [Emergency Evacuation] [P]lan, not the implementation of the franchisee in Pakistan that we're focusing on." If Marriott

had "an Emergency Evacuation Plan and it's fully adequate, . . . this case is done." ECF No. 65-1, p. 10. This Court concluded that the allegations in the Second Amended Complaint were sufficient to survive Marriott's Motion to Dismiss, and allowed the Plaintiffs to conduct discovery so that a fully-developed record would be available to the Court.

Following denial of the motion, extensive discovery took place and, over objection, the Plaintiffs were permitted to file a Third Amended Complaint to include additional factual allegations developed through the course of discovery. ECF Nos. 113, 114. Marriott then moved to dismiss the Third Amended Complaint or, in the alternative, for summary judgment. ECF No. 115. The motion has been fully briefed and argued, and the Court, as explained below, concludes that Marriott's motion must be granted.

### **Standard of Review**

Although Marriott's motion is styled as a motion to dismiss or, in the alternative, for summary judgment, both parties have relied upon extensive materials developed in the course of discovery. Accordingly, the motion will be judged under the familiar standards applicable to motions for summary judgment.

Summary judgment is proper if there are no genuine issues of material fact and "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)(internal quotation marks and citation omitted); *see also Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Disputes of material fact are genuine if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The Court may only rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (citing *Celotex*, 477 U.S. at 323-24). When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment." *Thompson Everett, Inc., v. Nat'l Cable Adv.*, 57 F.3d 1317, 1323 (4th Cir. 1995)(internal quotation marks and citation omitted).

## Discussion

Hotels are not always what they seem to be. A hotel may be: (a) *owned and managed* by the entity whose name is posted on the door; (b) *managed, but not owned,* by the entity whose name is on the door; or (c) *neither owned nor managed* by the entity whose name is on the door but rather owned and managed by a franchisee pursuant to a franchise agreement authorizing use of the franchisor's name and marks. Within the Marriott system of hotels, some are owned (and thus managed) by Marriott, others are owned by non-Marriott entities but managed by Marriott,

and others are franchised hotels that are neither owned nor managed by Marriott. It is in this last category that the Hotel at issue in this case belongs.

The extensive discovery in this case has provided significant factual details with respect to the Islamabad Marriott Hotel. It is neither owned nor managed by Marriott, but rather is owned and managed by Hashwani, a franchisee of Marriott, which is required to comply with the conditions contained in its Franchise Agreement with Marriott. Under its franchise agreement, Hashwani was solely responsible for its own employment policies and decisions, and Marriott "does not exercise any direction or control over the employment policies or employment decisions of Hashwani." ECF No. 115-9, p.53. The franchise agreement specifies that "Hashwani is not [Marriott's] agent for any purpose in regard to Hashwani's employees or otherwise." ECF No. 115-9, p. 4. Paragraph 20.02.A of the franchise agreement specifies that it "does not create any fiduciary relationship between [Hashwani and Marriott. Marriott] and Hashwani are both independent contractors, and nothing in this agreement is intended to constitute either party as an agent, legal representative, joint venturer, partner, employee or servant of the other for any purpose whatsoever." ECF No. 115-9, p. 3. The discovery in this case has demonstrated that Marriott did not propose, draft or implement a security plan for the Hotel, but rather that Hashwani wrote and implemented its own security plan for the Hotel which addressed security strategies, threat scenarios, security layers, security equipment and other security concerns specific to the Islamabad Marriott Hotel.

The DiFedericos argue that testimony by Alan Orlob on January 8 and 28, 2009, before the House Committee on Homeland Security and Government Affairs supports their theory of liability. Mr. Orlob was deposed in this case, and made it clear that his comments before Congress concerning security activities of Marriott related to managed properties, and not to

franchised hotels. The testimony was given in response to terrorist attacks in Mumbai, India, and not in Pakistan.

The Plaintiffs also point to the existence of a Marriott "International Lodging Crisis Plan" and apparent deficiencies in that plan that, they contend, were responsible for the death of Mr. DiFederico. However, the unrebutted deposition testimony of two Marriott employees shows that the International Lodging Crisis Plan applied only to managed properties and was distributed to franchisee employees only as a possible resource for franchisees to create their own plan. Indeed, the Plan itself provides that it:

> was developed by Marriott International for *managed properties* outside the United States and Canada. The Plan is also distributed to franchised hotels and the franchisee companies because *the contents of this manual may help the franchised hotels in developing or improving their Local Crisis Management Plan*, even though some of the information in the Plan, such as the directions who to contact within Marriott International, are not applicable to hotels that Marriott International does not manage. (emphasis added)

ECF No. 115-2, Ex. P at 1-1. The security requirements established by Marriott for franchisees are outlined in the "Crisis Management Standards – Franchised Hotels," which is an August 2003 memorandum that requires franchisees only to "have local crisis management plans in place at their hotels." ECF No. 115-2, Ex. L at 1.

While the Third Amended Complaint contains three counts, all of them are premised upon a single legal theory, i.e., the alleged negligence of Marriott. For example, Count I, the wrongful death claim, is premised upon the negligence of Marriott leading to the death of the decedent and resultant losses to the beneficiaries as authorized by § 3-904 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland. Count II, the survivorship claim, is also based upon negligence, and is brought pursuant to § 7-401(y) of The Estates and

Trusts Article of the Annotated Code of Maryland, which permits a cause of action held by a decedent prior to his death to survive his death and be brought by the personal representative of his estate. Once again, however, the basis of this claim is negligence. Finally, the Third Amended Complaint contains a Count III which is described as being for vicarious liability. Vicarious liability is not a cause of action, but this Count seeks to impose liability vicariously on Marriott for the acts of its employees, once again based upon negligence. Accordingly, the entirety of the Third Amended Complaint, and the sufficiency of the summary judgment record supporting it, must be assessed on a theory of negligence.

    The theory of recovery of the Plaintiffs, as embodied in the Third Amended Complaint, focuses on alleged negligent acts of Marriott in Bethesda, Maryland (creation of an allegedly deficient security plan and allegedly inadequate training of hotel personnel), and not any alleged actions of Marriott in Pakistan. In their arguments before this Court, the parties appear to believe that Maryland law should apply to this case, and that may be so. However, "[i]n a diversity case, a district court applies the conflict-of-law rules of the state where it sits" and "[i]n Maryland, the principle of *lex loci delicti* applies for all tort claims." *DiFederico* at 807–08. The principle of *lex loci delicti* dictates that the applicable law is the law of "the state where the last event necessary to make an actor liable for an alleged tort takes place." *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999), quoting Restatement (First) of Conflict of Laws § 377 (1934). In the case of a negligence action, the last act necessary to make an actor liable is damage resulting from the breach of a duty.

    Assuming that the Plaintiffs have established that Marriott breached a duty in Bethesda, Maryland, no harm occurred to the Plaintiffs until damages were sustained in Pakistan, and thus the laws of Pakistan would appear to apply. In the final analysis, however, it may matter little

whether Maryland or Pakistani law applies because it appears that the laws do not differ in any substantial respect regarding the potential liability of a franchisor for injuries sustained on the premises of a franchisee that owns and manages the business.

On June 19, 2015, this Court entered an order directing the parties to provide supplemental briefing on the law of Pakistan, and they have done so.  ECF Nos. 131, 134, 135. Like Maryland, Pakistan permits both wrongful death and survival actions, and both are premised upon, as applicable here, a negligent act resulting in death.  The Pakistan Fatal Accidents Act of 1855 provides that:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, the party who would have been liable if death had not ensued, shall be liable to an action or suit for damages.  Thus, under Pakistani law the plaintiffs must prove that (1) the decedent was injured by the wrongful act and neglect or default of the defendant; (2) the decedent died in consequence of such injury; (3) at the time of this death the decedent had a right to recover damages; and (4) his beneficiaries have suffered pecuniary loss from his death.

*Mst. Razia Khatoon & 6 Others v. Provence of NWFP*, 2002 MLD 539 (Lahore DB).

Pakistan does not have a specific statute which regulates the relationship of a franchisor and franchisee, other than the Contract Act of 1872.  According to Ahsan Zahir Rizvi, an expert on the laws of Pakistan whose affidavit was submitted by Marriott, "to the extent a franchise agreement specifically creates an agency relationship, an individual injured on the premises of the franchisee *may* have a cause of action against a franchisor (as principal) for actions of the franchisee (as agent) should the agent have undertaken certain acts with lawful authority."

(emphasis in original) ECF No. 135-1, p. 3, ¶ 9. In this case, however, the franchise agreement between Marriott and Hashwani specifically negates the existence of any agency relationship.[2]

On the specific question of the franchisor-franchisee relationship, the Supreme Court of Pakistan has held that a franchise "is a license from the owner of trademark or trade name permitting another to sell a product or to serve under that name or mark. Precisely this definition is more akin to a license rather than an agency." *Bolan Beverages (Pvt) Limited v. Pepsico, Inc. et al*, PLD 2004 S.C. 860.

> The Lahore High Court has held that "a '*franchise agreement*' when entered into between private individuals, is a license, which means a personal privilege granted by one person to another without creating any legal right in the property subject-matter of 'franchise.' It is permissioned by the competent person/authority to another, to do an act which, without the permission would be illegal. The same is true for the grant of a franchise for the purpose of trade, business or calling and is revocable at the will of the grantor."

*Concentrate Manufacturing Company of Ireland v. Seven-Up Bottling Company*, 2002 CLD 77.

In the absence of an express agency relationship between a franchisor and a franchisee, the only other basis for imposing liability in this case under the laws of Pakistan would be direct negligence of the franchisor attributable to it as a result of its control of the instrumentality of the harm causing harm to a patron on the franchisee's premises, a view consistent with those of the forum state, Maryland.

Most cases in Maryland and in the Fourth Circuit that have examined the question of the liability of a franchisor for injuries sustained on the premises of a hotel owned and managed by a

---

[2] As noted above, the franchise agreement at ¶ 20.02.A specifically negates any agency relationship: "[This Agreement does not create any fiduciary relationship between the parties.] Marriott and Hashwani are both independent contractors, and nothing in this Agreement is intended to constitute either party as an agent, legal representative, joint venturer, partner, employ, or servant of the other for any purpose whatsoever." ECF No. 115-9, p. 3.

franchisee focus on the issue of control.  If the franchisor exercises direct control over a particular activity causing injury, the franchisor may be held vicariously liable.

In *Allen v. Greenville Hotel Partners, Inc.*, 409 F. Supp. 2d 672, 677 (D.S.C. 2006) *affirmed*, 276 Fed.Appx. 339 (4th Cir.(S.C.) May 01, 2008), the court examined the liability of Choice Hotels, Inc. (like Marriott, a hotel franchisor) for liability to the personal representative of the estate of guests who were killed in a hotel fire.  The court observed:

> The purpose of Choice's Rules and Regulations was to ensure a similar experience at all Comfort Inn franchise locations and "maintain[] . . . uniform service within, and public goodwill toward, the [Choice] system." *See Hayman v. Ramada Inn, Inc.* 86 N.C.App. 274, 357 S.E.2d 394, 397 (1987).  The "clear trend in the case law and other jurisdictions is that quality and operational standards and inspection rights contained in a franchise agreement do not establish a franchisor's control or right of control over the franchisee sufficient to ground a claim for vicarious liability as a general matter . . ."  *Kerl [] v. Dennis Rasmussen, Inc. []*, 682 NW 2d [328] at 338.  Additionally, the fact that Choice made recommendations in its Rules and Regulations, such as suggesting that RGH and Gedda install sprinklers, does not establish that Choice controlled RGH and Gedda.

Based on the record before it, which is not dissimilar to that before this Court, the court in *Allen* found that "Choice did not control the hotel's daily operations or hotel security and life safety systems.  Through the Agreement and the Rules and Regulations, Choice merely maintained 'uniform service within, and public goodwill toward, the [Choice] system.' [Citation omitted.]  As such, Choice cannot be liable under these facts on a theory of actual agency." *Id*. at 679.

In another South Carolina case, *Triplett v. Soleil Group, Inc*., 664 F.Supp 2d 645, 650 (D,S.C. 2009), the Court granted summary judgment to a franchisor sued by a patron of a franchisee who contracted Legionnaire's disease where, like here, the franchisor established operational standards and regulations and retained the right to inspect the franchisee's premises

10

to assure conformity, but did not exert control over the franchisee's day-to-day operations or otherwise exert sufficient control to create a duty owed to hotel guests.

In the small number of cases in which liability of a franchisor was found in the absence of control by the franchisor, the common thread is agency by estoppel or apparent agency, theories that cannot factually be asserted on the record before this Court. These cases, as discussed below, have, as a common theme, proven *reliance* by a patron on the franchisor's mark. The absence of proven reliance by the patron is fatal to such a claim. There is simply no evidence in the record before this Court that Mr. DiFederico made his decision to stay at the Hotel as a result of the existence of the Marriott brand or his reliance upon the adequacy of Marriott's security procedures. Therefore, even if this Court were to embrace the view of those cases that allow a recovery on the basis of apparent authority or agency by estoppel, there is simply no factual basis in this case upon which such a recovery could be made.

In *Crinkley v. Holiday Inns, Inc.,* 844 F.2d 156 (4th Cir. 1988), the Fourth Circuit upheld an award of damages against a franchisor in a case having a vastly different factual basis that does not exist in this case. In *Crinkley*, the Fourth Circuit pointed out that there is a "principle of apparent agency or agency by estoppel under which agency itself may be imposed by law on legal relations. Though no actual agency exists, a party may be held to be the agent of another on the basis that he has been held out by the other to be so in a way that reasonably induces reliance on the appearances." The Fourth Circuit concluded, applying North Carolina law, that a jury could reasonably conclude that the Holiday Inn-Concord was operated in such a way as to create the appearance that it was owned by Holiday Inns, Inc., and that this was one of the purposes of the franchise agreement. *Id.* at 167. The court went on, however, to distinguish, and contrast, the decision in *Hayman v. Ramada Inn, Inc.*, 86 N.C.App. 274, 357 S.E.2d 394 (1987)

rev. granted in part, 320 N.C. 631, 360 S.E.2d 87 (1987) which rejected a comparable agency claim against a motel franchisor. As the Fourth Circuit noted in *Crinkley*, "the motel guest [in *Hayman*] was required by her employer to stay at the franchised hotel, and on this basis the North Carolina court held as a matter of law that necessity rather than reliance on the franchisor's representations dictated the guest's choice. Here, by contrast, the guests were exercising free choice so that their reliance on the franchisor's representations as the controlling factor in this choice was reasonably inferable as a matter of fact." Thus, proof of reliance on the franchisor's mark is essential to a recovery on this basis.

As the Court of Appeals of Maryland noted in its decision in *B. P. Oil Corporation v. Mabe*, 370 A.2d 554, 561 (Md. 1977),

> The textwriters indicate that reliance is necessary to establish agency by estoppel. *See, e.g.,* 1 F. Mechem, *Law of Agency* § 245 (2d ed. 1914) which states in discussing the matter:
>
> "Estoppel is always a matter personal to the individual asserting it and he must therefore show that he was misled by the appearances relied upon. It is not enough that he might have been, or that some one else was, so misled. It must also appear that he had reasonable cause to believe that the authority existed; mere belief without cause, or belief in the face of facts that should have put him on his guard is not enough." *Id*. at 177-78.

In later cases, Maryland appellate courts have reiterated that a successful plaintiff suing a franchisor based on agency by estoppel or apparent agency must demonstrate that (1) the franchisor created, or acquiescenced in, the appearance that an agency relationship existed, (2) the plaintiff believed that an agency relationship existed and relied upon that belief in seeking the services of the franchisee, and (3) the plaintiff's belief and reliance were reasonable. *Chevron, U.S.A., Inc. v. Lesch*, 570 A.2d 840 (Md. 1990), *Bradford v. JAI Medical Systems*, 93 A.2d 697 (Md. 2014), *Schear v. Motel Management Corp.,* 487 A. 2d 1240 (Md. App. 1985).

**Conclusion**

Albert DiFederico died serving his country as a State Department civilian contractor at the hands of Pakistani terrorists. His tragic death is one that understandably generates concern and sympathy. However, under the law and the facts of this case, the Court concludes that liability cannot attach to Marriott. Liability, if any, is the responsibility of Hashwani, because Marriott simply did not exert sufficient control over the operations of the Hotel to make it responsible for Mr. DiFederico's death. Accordingly, the Court will, by separate order, grant Marriott's motion.

September 18, 2015  /s/
Date  Roger W. Titus
 United States District Judge